No. 56,886

STATE OF KANSAS, *Appellee*, v. IVORY L. HAISLIP, *Appellant*.

(701 P.2d 909) ·

Opinion filed June 21, 1985.

*Thomas E. Malone,* of Redmond, Redmond, O'Brien & Nazar, of Wichita, argued the cause and was on the brief for the appellant.

*Geary N. Gorup,* assistant district attorney, argued the cause, and *Robert T. Stephan,* attorney general, and *Clark V. Owens,* district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is an appeal from a conviction for mur-

der in the first degree (K.S.A. 21-3401), and aggravated battery of a law enforcement officer (K.S.A. 21-3415). This conviction followed the third trial of Ivory L. Haislip (defendant-appellant) on the charge of first-degree murder of Officer Paul Garofalo. This is also his third appeal.

The facts were stated in *State v. Haislip*, 234 Kan. 329, 329-33, 673 P.2d 1094 (1983), as follows:

"The facts reveal Officers Paul Garofalo and Randy Mullikin of the Wichita Police Department were on routine vehicular patrol in the early morning hours of November 8, 1980. At 3:30 a.m. they were proceeding west on 9th Street. Garofalo was the driver. They passed through the intersection of 9th and Washington and stopped one-half block west where they observed two black women and a man. They had a brief conversation with one of the women and then turned back to the east. They parked in front of an after-hours bar, the Chicken Shack. It is located on the second story of a building located on the northeast corner of 9th and Washington streets. A number of people had congregated on the sidewalk there.

"The officers spoke to Regina Franklin and Krystal Butler. Both women stood on the passenger side of the car and conversed through the open front window. Krystal was to the front and Regina to the rear of that window. Officer Garofalo was leaning from his position on the driver's side across Officer Mullikin to converse with the women. After a short conversation Mullikin heard a loud noise he thought was a car backfiring. The noise was a shotgun blast fired twice at close range into the head and back of Officer Garofalo through the car window on the driver's side. A few stray pellets hit Mullikin's leg.

"After the second shot Mullikin rolled out of the car and sought cover. When he looked back he saw people running but no gunman. He returned to the car and radioed the dispatcher for help. Officer Garofalo lay in the driver's seat, his head tilted back, bleeding profusely. With the help of a person identifying himself as a paramedic, Mullikin lowered Garofalo from the car to the pavement outside the car where they attempted to administer C.P.R. There were no vital signs. At this time Mullikin observed a shotgun lying beside the car. He picked it up and placed it in the car.

"Officer Pete Dubovich and other officers arrived at the scene shortly thereafter. They observed Officer Mullikin, who was wounded and appeared in shock. Dubovich took charge and secured the area. In so doing he discovered a pool cue case lying on the north curb just to the east of Washington Street. He told a rookie policeman to guard it.

"Next Dubovich observed a black man, later identified as Dale Jackson, standing beside Paul Garofalo, together with Larry Mitchell, the person who claimed to be a paramedic. Officer Dubovich authorized Mitchell to assist. The ambulance arrived. Officer Garofalo died from the shotgun wounds to the back of his head.

"While Officer Dubovich was busy sealing off the area and doing preliminary investigative work, he forgot about the pool cue case. At trial he testified he felt it was safe with the rookie standing guard. He returned an hour or two later to discover both the pool cue case and the rookie gone. The case was subsequently

found a block away on Washington Street. Officer Dubovich saw Anthony Ray Martin at the scene among the crowd which gathered after he arrived.

"Officer Mullikin informed the policemen that an individual in a white three-piece suit (Dale Jackson) had information about the crime. Jackson was taken to the City Building for interrogation. After he was promised protection and discussed the matter with his girlfriend, Jackson stated Ivory Haislip was the person who shot Officer Garofalo. Jackson had made prior inconsistent statements.

"Mullikin also identified Ivory Haislip as the man he and Garofalo had seen one-half block west prior to the shooting. His first description of the man was inconsistent with Haislip's actual appearance.

"Regina Franklin, one of the women talking to the officers when the shooting occurred, talked to the police the next day. She picked Haislip's photograph out of a group when she was directed to pick out the killer.

"At 4:30 a.m., November 9, 1980, Ivory Haislip was arrested for the murder of Officer Garofalo.

"Police later were informed Haislip went to the home of Dorothy Jones and Hubert Jeffries late on the Saturday night of the shooting. They stated he appeared high and when Ms. Jones mentioned the killing of the officer, Haislip said, 'I did it.' Neither of them believed him.

"The clincher in the case against Haislip was the statement of Anthony Ray Martin. Martin had been picked up by the police on December 11, 1980, on other matters but was interviewed by the district attorney about the Garofalo homicide. Martin identified Haislip as the murderer. He was not held on the charges for which he was picked up. Martin had previously told the police he saw the man with the pool cue case with the gun but did not see his face.

"The case against Haislip appeared airtight, particularly to the prosecutor's office because at that time nothing was known of a statement of police informant Al Bowens to the police which would later introduce a new element into the case. The prosecutor did not hear of Bowens' statement until December 28, 1981.

"Bowens gave a taped statement to the police department on November 11, 1980, and a second statement two days later. He told the detectives he was driving west on 9th Street at about 3:30 a.m. November 8, 1980, and saw Anthony Ray Martin walk across the street in front of his car. He stated Martin was carrying a pool cue case with the butt end of a gun sticking out of it. Bowens turned right and parked in a church parking lot. He discussed what he saw with the two people who were riding with him. As he assisted the person in the back seat in getting out of his two-door car, he heard a gunshot and looked toward its source at the parked police car. Bowens saw Martin there and then saw Martin throw something down and run northeast in front of Bowens' car again. The police officers gave the statements no credence and told Bowens it was impossible for him to have seen what he saw. The tapes did not again emerge for over a year.

"With that battery of witnesses minus Al Bowens, Ivory Haislip was tried and convicted of murder in the first degree and aggravated battery of a law enforcement officer on May 15, 1981.

"Haislip filed a motion for a new trial. In the hearing on the motion on June 9, 1981, new evidence was produced. Krystal Butler, one of the women talking to

the officers at the time of the shooting, and Clementine Gasper, a spectator on the sidewalk at the time, testified they saw Anthony Ray Martin kill the officer. The motion was overturned. Haislip was sentenced to life and fifteen years to life to run concurrently.

"Haislip appealed his conviction and filed his second motion for a new trial with this court. We remanded the case to the trial court for a hearing on his claim of newly discovered evidence. Eleven witnesses testified for Haislip. Six of them testified they saw Martin shoot the officer. Regina Franklin recanted her previous testimony identifying Haislip as the murderer. On October 30, 1981, a new trial was ordered and set for December 7, 1981.

"The granting of the new trial caused the State to start a completely new investigation of the case. Initially one hundred seventy-five witnesses were endorsed on the information by the State. This list eventually grew to over two hundred witnesses. The volume of evidence to be reviewed consisted of reports, statements and prior testimony. The task was staggering. The State asked for and received a continuance of the trial from December 7 to January 11, 1982. Haislip objected.

"Finally, on December 28, 1981, the prosecutor was informed of Al Bowens' two taped statements with regard to Anthony Ray Martin's involvement. The district attorney had given no credence to the testimony of Haislip's witnesses in the hearings on the two motions for a new trial. Only after hearing the Bowens statements did suspicion seriously focus on Martin, and then with much skepticism. On January 8, 1982, the State charged Martin with the identical offenses as Haislip. On January 11, 1982, the State again asked for a continuance, this time for one week. It was granted over Haislip's objection. After an oral motion to consolidate the two cases was denied, on January 14, 1982, the cases against Haislip and Martin were dismissed without prejudice and one case instantaneously filed against both of them. The charges were identical to those in the original case against Haislip.

"The next procedural development in the case was the filing of Anthony Ray Martin's motion for a bill of particulars on January 22, 1982, which the State furnished on February 5. The bill charged Haislip as principal and Martin as aider and abettor."

Both Haislip and Martin where convicted as charged in the second trial. They each appealed to this court. The conviction against Haislip was reversed and remanded in *State v. Haislip*, 234 Kan. 329. The conviction against Martin was reversed and remanded with directions to grant him a separate trial in *State v. Martin*, 234 Kan. 548, 673 P.2d 104 (1984). Martin has since been acquitted of the charges against him. We recently sustained the State's appeal on a question reserved in connection with the acquittal. *State v. Martin*, 237 Kan. 285, 699 P.2d 486 (1985).

On March 19, 1984, following the presentation of evidence in Haislip's third trial, the jury returned a verdict of guilty. The defendant raises ten issues for our review. Five of the issues

concern the trial court's denial of certain requests made by the defendant in pretrial motions, including motions for a continuance, funds to employ an expert in hypnosis, funds for a public opinion poll, a change of venue, and request for an individualized voir dire examination. The defendant further claims it was error for the trial court to discharge a juror, without holding a hearing, after deliberations had commenced.

Prior to trial, the defendant moved to suppress the testimony of witnesses Dale Jackson and Randy Mullikin contending their memories had been enhanced through hypnosis. The defendant also moved to suppress the in-court identification of the defendant made by Dale Jackson due to its suggestiveness. After hearing evidence, the trial court denied both motions and the defendant claims the court erred in doing so.

The defendant also alleges that the trial court erred in striking the testimony of a witness, Krystal Butler, concerning hearsay statements made by Anthony Ray Martin.

Finally, the defendant contends the trial court erred in introducing the prior recorded testimony of Anthony Ray Martin on the ground that Martin was "unavailable" as a witness.

Additional facts will be developed when necessary to discuss the issues raised.

The appellant first contends that the trial court committed reversible error in replacing one of the jurors with an alternate, after deliberations had begun, without an examination of the juror. The jury was instructed and commenced deliberation on March 14, 1984. On March 15, the court received a handwritten note from one of the jurors requesting that she be excused as a juror. The note stated:

"I told the Judge and the attorneys right from the beginning, during voir dire, that I could not handle this. I was asked if the fact that this is a murder trial bothered me and I said, 'Yes.' Nothing was done. I later brought it up and still nothing was done. I would like to be removed. I am not the deciding vote at this time so that has nothing to do with my feelings."

Judge Sanborn notified counsel of the note and a discussion was held in chambers on whether the juror should be excused. Counsel for both the State and the defendant urged the court to examine the juror in greater detail regarding her reasons for being excused. The court believed a hearing was unnecessary since there was no claim of juror misconduct. See *United States*

*v. Yonn*, 702 F.2d 1341 (11th Cir. 1983). Based on the contents of the note and the juror's statements during voir dire, the court found the juror was "simply not up to the stress of a decision," and excused her for incapacity. One of the alternate jurors was selected to replace the excused juror. The court then ordered the jury to begin deliberations anew. The jury returned the verdict four days later.

The defendant argues that the trial court erred by failing to hold a hearing to determine if there were grounds for the juror's discharge, thereby denying him the right to have his guilt or innocence determined by the jury which he selected. He contends he was prejudiced because if the excused juror had remained, a hung jury may have resulted. The defendant further argues that the trial court erred by failing to question the alternate juror, who had been sequestered after the close of the evidence, as to whether he had been "tainted" during this time.

K.S.A. 1984 Supp. 22-3412(3) governs substitution of a juror with an alternate, and provides, in pertinent part, as follows:

"Immediately after the jury is empaneled and sworn, a trial judge may empanel one or more alternate or additional jurors whenever, in the judge's discretion, the judge believes it advisable to have such jurors available to replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable to perform their duties. . . . If the alternate jurors are not discharged on final submission of the case and if any regular juror shall be discharged from jury service in any such action prior to the jury reaching its verdict, the court shall draw the name of an alternate juror who shall replace the juror so discharged and be subject to the same rules and regulations as though such juror had been selected as one of the original jurors."

K.S.A. 1984 Supp. 22-3412(3) does not state the grounds for which a juror may be dismissed and substituted. The defendant argues that the grounds for substitution of a juror are the same as the grounds for challenging a juror for cause under K.S.A. 22-3410 and that since the court did not conduct a hearing to find that this juror could not act impartially or was prejudiced, within the meaning of K.S.A. 22-3410(2)(i), it erred by dismissing her. The defendant cites no authority for his assertion that the 22-3410 "challenges for cause" are impliedly incorporated into 22-3412(3), and we specifically find that they are not incorporated. The attorney's right to challenge jurors for cause prior to their being impaneled and the trial court's discretionary power

to later excuse a juror due to incapacity are two entirely different matters which should not be confused.

This court dealt with substitution of a juror with an alternate in *State v. Folkerts*, 229 Kan. 608, 629 P.2d 173, *cert. denied* 454 U.S. 1125 (1981). In that case, one of the jurors phoned the judge during a weekend recess and advised him of her grandfather's death and her need to attend the funeral out of state. The judge excused her, without a hearing, and appointed one of the alternates to take her place. In finding the judge's actions were a proper exercise of his power of discretion, we stated:

"Our statute K.S.A. 22-3412(3) is similar to F.R.Cr.P. 24(c) and under the federal cases it is well established that the substitution of an alternate for a juror for *reasonable cause* is within the prerogative and discretion of the trial court. *United States v. Ellenbogen*, 365 F.2d 982 (2nd Cir. 1966), *cert. denied* 386 U.S. 923 (1967). See also, 2 Wright, Federal Practice and Procedure: Criminal § 388, and Annot., 10 A.L.R. Fed. 185. The point is without merit." 229 Kan. at 616. (Emphasis added.)

The facts in the case at bar differ from those in *Folkerts* in one important aspect. In *Folkerts*, the juror was dismissed and substituted prior to the time the jury retired, while in this case, the jury had begun deliberations.

In *Folkerts*, we noted the similarity of Fed. R. Crim. Proc. 24 and K.S.A. 22-3412. However, the rules differ in that Rule 24 *does not* allow for substitution of an alternate after deliberations have begun. Prior to 1983, the federal rules did not even allow for a juror's dismissal once deliberations had begun. In *United States v. Lamb*, 529 F.2d 1153, 1156 (9th Cir. 1975), the Ninth Circuit court stated that one of the reasons for this rule is that to allow substitution after deliberations have begun might "significantly limit the accused's right to a mistrial if the original jury cannot reach agreement." In 1983, Fed. R. Crim. Proc. 23(b) was amended to allow a juror to be discharged after deliberations have begun and to allow the court to accept a verdict from eleven jurors, even without stipulation of the parties. Therefore, Congress has impliedly stated that a criminal defendant has no absolute right to the original twelve jurors, even if it can be speculated that by keeping them, a hung jury may have resulted.

K.S.A. 1984 Supp. 22-3412(3) allows for substitution of an alternate after deliberations have begun as long as the alternate has not been discharged. Therefore, there is no "right" under Kansas law to the original twelve jurors. Accordingly, the de-

fendant's claim of prejudice, based on his speculated loss of a mistrial due to a hung jury, is without merit.

In the case at bar, the alternate had not been discharged when deliberations commenced. The court had, in fact, sequestered the alternate while the jury deliberated. Once the alternate was substituted, the court instructed the jury to begin its deliberations anew. This instruction was necessary as a defendant has a right to a verdict reached only after full participation of all of the jurors who ultimately return the verdict. *People v. Collins,* 17 Cal. 3d 687, 131 Cal. Rptr. 782, 552 P.2d 742 (1976).

Under Kansas law, if the alternate was not discharged and the court instructed the jury to begin deliberations anew after substitution, the standard to determine whether the trial court erred in dismissing and substituting a juror after deliberations had begun is the same as the standard for determining whether the court erred in discharging a juror prior to deliberations. Accordingly, we must apply the "reasonable cause" standard which was followed in *Folkerts.* In *Folkerts,* this court specifically stated that it was following the mandate of federal cases interpreting Fed. R. Crim. Proc. 24 when it adopted the "reasonable cause" standard. Therefore, we will look to federal law for guidance in determining whether the trial court, in the case at bar, abused its discretion.

In 2 Wright, Federal Practice and Procedure: Criminal § 388 pp. 386-89 (1982), it is stated:

"The substitution of an alternate for a juror for reasonable cause is within the prerogative of the trial court *and does not require the consent of any party.* The court has discretion in deciding when to make such a substitution. It also has discretion in the procedure to be used to ascertain whether a substitution should be made. Every effort should be made to give defendant and his counsel an opportunity to be heard before making such a substitution, but absent a showing of prejudice, reversal is not required for failure to do so." (Emphasis added.)

In this case, the court refused to hold a hearing to examine the juror more fully about her reasons for wanting to be excused. Although it would have been a *better practice* for the court to have conducted a hearing, the defendant has failed to show he was prejudiced by the lack of one. See, *e.g., Commonwealth v. Haywood,* 377 Mass. 755, 388 N.E.2d 648 (1979). Therefore, we cannot find that the court erred by excusing the juror without a hearing.

The court relied on the juror's note and her statements during voir dire in finding she was mentally incapacitated to perform

her duty. The pertinent portions of her voir dire examination were as follows:

"[COUNSEL]: Okay, is there anything about the nature of this charge that makes you think you could not be a fair and impartial juror. . .?

"[JUROR]: I am nervous.

"[COUNSEL]: Is there something in particular you are nervous about? Is it this particular case or just being on a jury that's making you nervous?

"[JUROR]: This particular case.

"[COUNSEL]: Can you tell me what it is in particular that makes you nervous about sitting as a juror on this case?

"[JUROR]: No, not really.

"[COUNSEL]: Do you feel that you are under some kind of special pressure as a juror on this case, ma'am?

"[JUROR]: Yes.

"[COUNSEL]: Okay, what kind of special pressure do you feel?

"[JUROR]: I just can't describe it.

"[COUNSEL]: Would it have anything to do with the fact that Mr. Haislip is black?

"[JUROR]: No.

"[COUNSEL]: Okay, good. Would it have anything to do with the neighborhood where you live or the people you know?

"[JUROR]: No.

"[COUNSEL]: Okay, I guess I really need to ask you, please, if you can, to describe what special pressure you feel in this case. I am certain that everyone who is selected as a juror will feel an obligation, as one should, but if there is something special bothering you, I really need to know about it.

"[THE COURT]: . . .[Do] you mind if I ask a question?

"[COUNSEL]: No.

"[THE COURT]: Ma'am, if you take an oath to well and truly try the issues according to the law and the evidence, will you do that?

"[JUROR]: Yes.

"[THE COURT]: Very well.

"[COUNSEL]: Ma'am, do you feel that the special pressure you are under may distract you from the trial of this case?

"[JUROR]: No.

"[COUNSEL]: Do you think that the pressure you feel might influence your verdict in this case?

"[JUROR]: Yes.

"[COUNSEL]: Whatever special pressure you feel won't keep you from being a fair and impartial juror to both the State and to the Defendant?

"[JUROR]: (shakes head negatively.)"

This juror had said during voir dire that she thought her verdict would be "influenced," but she felt she could be fair and impartial. As evidenced through her note, she obviously discovered that the "special pressure" she felt had incapacitated her ability to be "fair and impartial." We do not find the trial judge

abused his discretion by finding this was reasonable cause to dismiss her. There was no error in the court's dismissal of the juror.

The defendant also argues that the alternate juror should have been examined about whether his absence had possibly "tainted" him. However, the alternate juror had been sequestered following the trial and there is no suggestion that his ability to serve as a fair and impartial juror was in any way impaired. See *United States v. Barker*, 735 F.2d 1280, 1283 (11th Cir. 1984). Moreover, the defendant failed to object to the court's failure to question the juror and so has waived his right to appeal on this issue.

The defendant next contends that the trial court erred by denying his motion for a two-week continuance made on February 16, 1984.

K.S.A. 22-3406 provides that a defendant shall be entitled to a *reasonable time* after arraignment to prepare for trial. K.S.A. 22-3401 states that "continuances may be granted to either party for good cause shown."

The granting of a continuance lies within the sound discretion of the trial court and its refusal to grant a continuance will not be overturned in the absence of a clear abuse of discretion. *State v. Cameron & Bentley*, 216 Kan. 644, 533 P.2d 1255 (1975). Discretion is abused only where no reasonable man would take the view adopted by the court; if reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said the trial court abused its discretion. *State v. Wilkins*, 220 Kan. 735, 556 P.2d 424 (1976).

The defense attorneys who represented Haislip at his third trial began representing the defendant on his appeal following his first trial. They then represented him through his second trial and his second appeal. On December 2, 1983, the defendant's second conviction was overturned by the Kansas Supreme Court. The counsel were reappointed during the last week of January 1984. On February 3, 1984, a pretrial conference was held and the parties were informed that all pretrial motions were to be filed by February 21, 1984, that jury selection would commence on February 27 and that the trial would begin on March 5. Both parties objected to the trial date, but the objections were overruled. However, the administrative judge subsequently agreed

to delay the selection of jurors until March 5. On February 16, 1984, the defendant filed a motion requesting a two-week continuance. The motion was denied despite the prosecutor's request that it be granted.

Subsequent to the denial of the motion, the defense filed fourteen pretrial motions requesting the suppression of evidence, change of venue, the right to conduct an individualized voir dire of prospective jurors, funds to employ an expert in hypnosis, a bill of particulars, exclusion of television and still cameras from the courtroom, sequestration of jurors, funds to conduct an opinion survey, suppression of in-court identification of defendant, allowance of jury to view the scene of the crime, an order in limine relating to autopsy evidence, an order in limine relating to the dispatcher tapes and an order to compel the State to disclose any rewards or inducements to witnesses.

The defendant did not renew the motion for a continuance following voir dire or on the day of trial. Based on our reading of the record, it appears that the defense was prepared and had been able to locate all the necessary witnesses. On appeal, the defendant alleges that he was unable to locate all of the witnesses; however, the defendant does not demonstrate who was missing or why their testimony was important or why lack thereof prejudiced the defense.

Absent a showing of actual prejudice to the defendant, the trial court's refusal to grant a continuance did not constitute an abuse of discretion. *State v. Cameron & Bentley*, 216 Kan at 647. In this case, the defense counsel, who had been working with the case for two and one-half years, were able to prepare and file numerous pretrial motions, were prepared for trial, and failed to renew their motion for a continuance at the close of voir dire examination. Even though we agree with the defendant that this case has an unusually voluminous record, and that both the defense counsel and the prosecution could have used additional time to prepare, we cannot find that the defendant was actually prejudiced. Therefore, the trial court did not err by denying the motion.

Defendant's next issue concerns the trial court's exclusion of a statement allegedly made by Anthony Ray Martin to Krystal Butler within two weeks after the shooting.

Krystal Butler was one of the two young women standing

beside the police car talking to Officer Mullikin when the shotgun blasts were fired on November 8, 1980. Ms. Butler, in her statement to investigators on November 13, 1980, said that she saw, but did not recognize, the assailant. She also said that the assailant was not Anthony Ray Martin, with whom she was acquainted. In October 1981, at a hearing on the defendant's motion for new trial after his first conviction, Ms. Butler testified that after she heard the shots, she looked up and saw Martin on the other side of the car. She testified that she did not tell the investigators at first because she was scared of Martin.

At Haislip's third trial (the subject of this appeal), Krystal Butler again testified to having seen Anthony Ray Martin. The district attorney impeached her testimony by introducing her prior inconsistent statements.

On direct examination, the following colloquy occurred in which Ms. Butler began testifying to a conversation she'd had with Martin prior to giving any statement to the police:

"[COUNSEL]: Now, shortly after this happened, you were talked to by the Police, weren't you?

"[MS BUTLER]: Yes.

"[COUNSEL]: You didn't tell them it was Anthony Ray Martin you saw, did you?

"[MS BUTLER]: No, I didn't, not at first.

"[COUNSEL]: Why not?

"[MS BUTLER]: Because I was scared.

"[COUNSEL]: Of what?

"[MS BUTLER]: Ray Martin.

"[COUNSEL]: Why?

"[MS BUTLER]: Because I had seen him two weeks before. I had talked to Mr. Martin and we had a conversation, and then after we talked a little while, he said 'You know I did it, don't you?' And I said, 'I don't know what you're talking about.'

"[PROSECUTOR]: Objection, this is hearsay."

The court sustained the objection and excluded the testimony on the theory that Martin was unavailable for cross-examination (Martin had asserted his Fifth Amendment right against self-incrimination), and made no mention of K.S.A. 60-460(j), which defendant, for the first time on appeal, urges as his basis for the admission of the evidence.

K.S.A. 60-460(j) is the hearsay exception for statements against interest. It provides:

"Evidence of a statement which is made other than by a witness while testifying at the hearing offered to prove the truth of the matter stated is hearsay evidence and inadmissible except:

. . . .
"(j) *Declarations against interest.* Subject to the limitations of exception (f), a statement which the judge finds was at the time of the assertion so far contrary to the declarant's pecuniary or proprietary interest or so far subjected the declarant to civil or criminal liability or so far rendered invalid a claim by the declarant against another or created such risk of making the declarant an object of hatred, ridicule or social disapproval in the community that a reasonable man in the declarant's position would not have made the statement unless the man believed it to be true."

The test of admissibility under K.S.A. 60-460(j) was stated in *Thompson v. Norman,* 198 Kan. 436, 424 P.2d 593 (1967), and reiterated in *State v. Prince,* 227 Kan. 137, 605 P.2d 563 (1980). The statute requires, as a "preliminary measure of trustworthiness," the trial judge make a finding, prior to admitting a declaration against interest, that:

"[T]he character of the declaration was of such nature a reasonable man would not make it unless he believed it to be true. Probability of veracity is the safeguard sought; the reasonable man test is the criterion to be used. The judge may in a particular case be faced with a difficult decision where caution should be exercised; in making it he necessarily must be vested with a wide discretion. . . .

". . . In determining admissibility he may consider the nature and character of the statement, the person to whom it was made, the relationship of the parties, the probable motivation of the declarant in making the statement, and the circumstances under which it was made.

. . . .
"The burden was upon the defendant to satisfy the foundational requirements prior to admission of the declaration. Whether these requirements were satisfied is a matter committed to the discretion of the trial judge." *Thompson v. Norman,* 198 Kan. at 443.

Although a trial court does have discretion to exclude a declaration against penal interest when the required finding cannot justifiably be made under the circumstances surrounding the making of the declaration, the trial court in this case did not consider the statement as a declaration against penal interest. This reason for its admission was *not asserted* by defense counsel in arguing the matter to the trial court. Therefore, the trial judge was not called upon to make the requisite finding.

Had the trial court been given an opportunity to consider the admission of this evidence as an exception to the hearsay rule under 60-460(j), the evidence may have been admitted. However, the defendant's assertion of this point on appeal for the first

time comes too late. *State v. Darling*, 208 Kan. 469, 475, 493 P.2d 216 (1972); see also *State v. Quick*, 226 Kan. 308, 317, 597 P.2d 1108 (1979).

The next issue concerns the admissibility of the testimony of the State's two eyewitnesses when they had undergone hypnosis sometime prior to trial for the purpose of refreshing or restoring their memories of the incident. The trial court, after conducting a pretrial hearing, held that the pretrial use of hypnosis did not affect the admissibility of the witnesses' testimony, *but that they could not testify to facts stated for the first time while under hypnosis.* The court further held that the defendant could present testimony on the possible suggestive effects of the hypnosis. Both witnesses testified at trial, but no evidence was presented concerning the fact of, or effect of, the hypnosis. On appeal, the defendant claims that the use of the posthypnotic testimony was a denial of his right to effectively confront and cross-examine the witnesses against him. He argues that the testimony of both witnesses should have been suppressed. This is a question of first impression in Kansas.

A review of the facts involved in consideration of this issue is warranted. The State had two witnesses who were able to place the defendant at the scene of the crime—Dale Jackson and Officer Randy Mullikin. Dale Jackson, a bouncer at the Chicken Shack, was identified to one of the officers, upon the officer's arrival at the scene of the crime, as a potential witness. Consequently, Jackson was taken to the police station. In his first interview on the morning of November 8, Jackson told the police that he had witnessed the shooting and described the assailant as a black male, possibly in his 30's, who was 5'11" to 6' tall, did not wear glasses, had no facial hair, and was possibly wearing a long black coat. He further stated that when he first heard the shots, one of the officers was already out of the car. Jackson said he took cover when he heard the first shot, and the suspect was gone when he looked up.

Jackson was interviewed for a second time later the same morning. He was informed by the police that he could receive complete police protection, including being moved to another city and provided with a job until the trial. He was further informed that the killer would soon find out that Jackson was a material witness, and his life might be in danger. Jackson stated

that he was afraid for himself and his girlfriend. Once again, Jackson did not identify the assailant.

Following this interview, Jackson was transported by the police to the home of his girlfriend, Rose Phillips. Jackson was allowed to be alone with her for about twenty minutes, and, afterwards, he and his girlfriend were taken to a motel where a police officer remained with them. Later that same evening, Jackson was returned to the police station and interviewed a third time. He still did not make an identification.

Jackson was interviewed for the fourth time on November 9. The police showed him a Polaroid picture which had been taken of some of the people who were at the scene when the police arrived. Jackson said he did not recognize anyone. The defendant was not pictured. The police then showed the photo to Rose Phillips. She identified one person in the picture, but stated "that isn't the person Dale [Jackson] says shot the officer." She said he had told her it was someone by the name of "Ivory." She was able to identify a photo of the defendant, Ivory Haislip, for the police, after being shown a lineup of 5 photographs.

The police then took the photo lineup to Jackson. However, before he was asked to make an identification he was allowed to have a private conversation with Rose Phillips. Subsequent to this conversation Jackson identified the defendant's photo indicating that Ivory Haislip shot the officer.

On November 18, 1980, prior to any judicial hearing, Jackson was hypnotized by Maynard Brazile, a policeman trained in hypnosis, at the direction of the police so that Jackson's memory of the events surrounding the shooting could be enhanced. While under hypnosis, Jackson stated he had seen Haislip shoot the officer. Before bringing him out of his trance, Brazile suggested to Jackson that he would remember the events exactly as he had just stated them and that Haislip's face would be implanted in his memory. The hypnosis session itself was tape-recorded, but the preliminary interview was not. A police officer remained in the room during the session. Two days later, Jackson was again hypnotized, this time by a psychologist, Donald E. Schrag. This session was not recorded, but Dr. Schrag took notes. Jackson again identified Haislip as the assailant. Jackson made a positive identification of the defendant in each subsequent judicial hearing.

It is noteworthy that three of the defense witnesses testified that Jackson was in the Chicken Shack at the time of the shooting and did not go outside until afterwards.

Officer Mullikin did not see the assailant. Immediately after the shots were fired, he ran from the car, but he returned within 30 seconds and found the gun. When he was initially questioned by police, he described a black male whom he had seen one-half block west of 9th and Washington a few minutes prior to the shooting. He said the man had straight hair "like a woman's" and was wearing a blue tee-shirt and blue jeans. He described the man as looking like a woman but without a woman's body—a female impersonator. He said this person had no facial hair.

Officer Mullikin was hypnotized by Maynard Brazile on November 18, for the sole purpose of discovering if he had actually seen the assailant and was suppressing the memory. Under hypnosis, Mullikin again stated that he had not seen the assailant. No new information was derived from the interview and no suggestions were made to Mullikin. The session was tape-recorded. *Mullikin maintained that he was never successfully hypnotized, and the trial judge found this to be true.*

It was not until the preliminary hearing that Mullikin remembered Haislip was the "female impersonator" whom he'd seen prior to the shooting. He later stated the defendant's mustache was the thing that jogged his memory. Mullikin had seen Haislip's picture in the paper prior to the preliminary hearing.

Prior to trial, the defendant moved for suppression of all testimony from Jackson and Mullikin. An extensive hearing was held. The court reviewed the taped hypnosis sessions, heard testimony from Maynard Brazile, Dr. Donald Schrag, Officer Mullikin, and Dale Jackson, and studied briefs submitted by both parties. The court then concluded in a short opinion that the testimony would not be suppressed, but the witnesses could not testify to any "new" facts derived from the hypnosis session. The court stated that the defendant could present testimony about the "suggestibility" effects of hypnosis. However, the court had earlier denied defendant's motion to obtain funds to employ an expert in hypnosis.

The issue before us is whether hypnotically refreshed testimony is admissible. In analyzing this rather complex issue, we will first briefly discuss the process of hypnosis and its relation-

ship to the judicial process. Second, we will examine the three categories of judicial decisions regarding this question. Finally, we will determine the rule to be followed in this state, and then apply it to the facts of this case.

I.

Hypnosis, although not fully understood, is capable of producing useful or beneficial results in limited contexts. It is often employed for medical reasons—to alleviate pain, to check compulsive habits such as smoking, to diagnose and treat mental disorders such as amnesia—and for purposes of criminal investigations. *People v. Hughes,* 59 N.Y.2d 523, 466 N.Y.S.2d 255, 453 N.E.2d 484 (1983). The latest, and most controversial, use of hypnosis is the introduction of testimony which has been enhanced through its use. This practice has not been endorsed by scientific experts. On the contrary, experts either condemn the practice or caution that such testimony should only be used under limited and controlled circumstances. See Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness,* 68 Cal. L. Rev. 313 (1980); Orne, *Use and Misuse of Hypnosis in Court,* 27 Int. J. of Clinical & Experimental Hypnosis, No. 4, pp. 311, 335-36 (1979).

The basic problem with admitting hypnotically refreshed testimony in evidence is that hypnosis is an inherently suggestive procedure. 68 Cal. L. Rev. at 333-34. In fact, suggestion is the method used to induce the hypnotic state. In *People v. Hughes,* 59 N.Y.2d 523, the court noted that the hypnotic subject will be affected—at least to some degree—in three major respects:

"First, a person who has been hypnotized becomes increasingly susceptible to suggestions consciously or unconsciously planted by the hypnotist or others present during the session. The place at which the procedure is employed and the purpose for conducting it may also suggest or affect the outcome.

"Second, the subject himself may confabulate, that is imagine incidents to fill memory gaps, by for instance imagining that he has experienced something he has simply heard from others. He may also intentionally fabricate events perceived to be beneficial to himself or those conducting the hypnotic session.

"Third, a person who has recalled an incident under hypnosis will experience an increased confidence in his subsequent recollection of that incident." 59 N.Y.2d at 534-35.

In addition to these dangers, it has been found that it is virtually impossible for the subject or the trained, professional hypnotist to distinguish between true memory and pseudo

memory. 68 Cal. L. Rev. at 337. If this is true, a lay observer—whether judge or jury—could not be expected to make the distinction.

In *People v. Shirley*, 31 Cal. 3d 18, 65, 181 Cal. Rptr. 243, 641 P.2d 775, *cert denied* 459 U.S. 860 (1982), the court, in discussing the third danger stated above (increased confidence), noted that this problem is often enhanced by two techniques commonly used by hypnotists:

"[B]efore being hypnotized the subject is told (or believes) that hypnosis will help him to 'remember very clearly everything that happened' in the past event, and/or during the trance he is given the suggestion that after he awakes he will 'be able to remember' that event equally clearly and comprehensively."

In short, hypnosis not only irrevocably masks whether a subject's recall induced by it is true, it also creates a barrier to the ascertainment of its truthfulness through cross-examination.

With this background, we turn to an examination of the various ways in which courts have dealt with the admissibility of hypnotically refreshed testimony.

## II.

We first note that there appears to be general agreement among the courts that the rule of *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923) (providing that scientific evidence will only be admitted if the procedure and results are generally accepted as reliable in the scientific community) applies to, and renders inadmissible, statements made by a witness under hypnosis when the statements are offered for the truth of their content. See, *e.g., State v. Conley,* 6 Kan. App. 2d 280, 627 P.2d 1174 (1981); *State v. Pusch,* 77 N.D. 860, 46 N.W.2d 508 (1950); *Jones v. State,* 542 P.2d 1316 (Okla. Crim. 1975); Annot., 92 A.L.R.3d 442, § 7.

The cases which produce disagreement are—like the case at bar—cases in which hypnosis was employed to refresh or restore the witness's memory. In these cases, the evidence offered at trial was not the actual statements made by the witness while under hypnosis, but the witness's present recollection which had been refreshed by hypnosis sometime prior to trial.

The initial response by courts faced with this issue was to treat hypnotically refreshed recollections the same as recollections refreshed in other legally acceptable ways. The first case to address the issue was *Harding v. State,* 5 Md. App. 230, 246 A.2d

302 (1968), *cert. denied* 395 U.S 949 (1969). In *Harding*, the court held that the use of hypnosis for this purpose affected only the weight of the evidence and not its admissibility. That decision was based on the testimony of a single expert who stated, "I ·seriously doubt suggestibility in the way we think of, in that you have an influence and the person subjects himself to your influence." 5 Md. App. at 240.

The argument in favor of this approach is that it allows the jury to hear all relevant testimony. Traditional legal devices including cross-examination, disclosure to the jury of the hypnotism, expert testimony, and appropriate instructions from the court, purportedly enable the jury to properly evaluate the witness's credibility. Ruffra, *Hypnotically Induced Testimony: Should it be Admitted?* 19 Crim. L. Bull. 293, 298 (1983). Since the *Harding* decision, several courts have followed its approach. See, *e.g., State v. Brown,* 337 N.W.2d 138 (N.D. 1983); *Chapman v. State,* 638 P.2d 1280 (Wyo. 1982); Annot., 92 A.L.R.3d 442.

Despite the claimed advantages of the "credibility" approach, the overwhelming scientific evidence is that hypnotically refreshed testimony may be completely unreliable, and this unreliability may be impossible to ascertain. Moreover, cross-examination will not be effective to safeguard against the problem of posthypnotic confidence. Due to the increased understanding of the evidentiary problems inherent with hypnosis, Maryland has since overruled *Harding. Collins v. State,* 52 Md. App. 186, 447 A.2d 1272 (1982).

A second approach was employed by the New Jersey Supreme Court in *State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (1981). The court found that the risk of suggestibility inherent in the procedure may be minimized if a series of standards or safeguards, proposed by various experts, is observed by those administering the hypnosis. The following guidelines were adopted:

First, a psychiatrist or psychologist experienced in the use of hypnosis must conduct the session . . . .

"Second, the professional conducting the hypnotic session should be independent of and not regularly employed by the prosecutor, investigator or defense. . . .

"Third, any information given to the hypnotist by law enforcement personnel or the defense prior to the hypnotic session must be recorded, either in writing or another suitable form . . . .

"Fourth, *before* inducing hypnosis the hypnotist should· obtain from the

subject a detailed description of the facts as the subject remembers them . . . .

"Fifth, all contacts between the hypnotist and the subject must be recorded. This will establish a record of the pre-induction interview, the hypnotic session, and the post-hypnotic period, enabling a court to determine what information or suggestions the witness may have received . . . .

"Sixth, only the hypnotist and the subject should be present during any phase of the hypnotic session, including the pre-hypnotic testing and the post-hypnotic interview." 86 N.J. at 545-46.

A number of other courts have adopted the *Hurd* approach. See *Brown v. State,* 426 So. 2d 76 (Fla. Dist. Ct. App. 1983); *State v. Beachum,* 97 N.M. 682, 643 P.2d 246 (1981); *State v. Martin,* 33 Wash. App. 486, 656 P.2d 526 (1982); Falk, *Posthypnotic Testimony—Witness Competency and the Fulcrum of Procedural Safeguards,* 57 St. John's L. Rev. 30 (1982).

Despite the theory behind this approach—to decrease dangers of suggestion and to increase reliability—the problem of being unable to determine what the witness may be confabulating still exists.

The third, and most extreme, approach thus far adopted is that hypnotically refreshed recollection fails the *Frye* test and that a witness who has been hypnotized is "contaminated" and is incompetent to testify, even to events recalled prior to hypnosis. See, *e.g., State v. Mena,* 128 Ariz. 226, 624 P.2d 1274 (1981); *People v. Shirley,* 31 Cal. 3d 18. Courts which adopt this view reject both the notion that a witness's having been hypnotized goes only to his credibility and the belief that the unreliability inherent in hypnosis can be eliminated or sufficiently curbed by following procedural safeguards. *United States v. Valdez,* 722 F.2d 1196, 1202 (5th Cir. 1984). By holding hypnotically refreshed testimony inadmissible, these courts risk excluding evidence which may be both relevant and probative on certain issues.

The courts which follow the extreme approach have necessarily made certain exceptions. For example, testimony of a criminal defendant is admissible even if he has undergone hypnosis because of the "fundamental right of an accused to testify in his own behalf." *Shirley,* 31 Cal. 3d at 67. Also, a previously hypnotized witness may be called on to testify about a matter wholly unrelated to the subject(s) of the hypnotic session. 31 Cal. 3d at 67.

Several courts, while holding that the events recalled after

hypnosis are inadmissible, hold that the witness may be permitted to testify to events recalled prior to hypnosis. See, *e.g.*, *People v. Quintanar*, 659 P.2d 710 (Colo. 1982); *Comm. v. Kater*, 388 Mass. 519, 447 N.E.2d 1190 (1983); *State v. Mack*, 292 N.W.2d 764 (Minn. 1980); *State v. Peoples*, 311 N.C. 515, 319 S.E.2d 177 (1984); *People v. Hughes*, 59 N.Y.2d 523; *State v. Martin*, 101 Wash. 2d 713, 684 P.2d 651 (1984). This view was characterized as the "emerging consensus" in *State v. Wren*, 425 So. 2d 756, 760 (La. 1983) (Calogero, J., concurring and dissenting).

## III.

After carefully reviewing each of the various approaches courts take to this issue, we find that the competing interests involved (admitting all relevant testimony while avoiding the inherent problems of hypnosis) are best met by allowing the witness to testify to events recalled prior to hypnosis, but not those first recalled during or subsequent to hypnosis.

Given the problems inherent in the hypnotic process, such as the enhanced suggestibility of the subject, the tendency to confabulate when there are gaps in recollection, and the increased confidence in the truthfulness and accuracy of posthypnotic recall which may preclude effective cross-examination, hypnotically refreshed testimony is simply too unreliable to be used as evidence in a judicial setting. We hold that hypnosis has not reached a level of scientific acceptance which justifies its use for courtroom purposes, and, according to the *Frye* test, events recalled subsequent to hypnosis are not admissible. We further conclude that no set of procedural safeguards can adequately remedy this unreliability.

Our rule of inadmissibility does not, however, render all testimony of a previously hypnotized witness inadmissible. A person who has been hypnotized may testify as to facts which he related before the hypnotic session. This is similar to the approach used for suggestive pretrial identification, where it has been held that the witness may make an in-court identification on the basis of recollections prior to the suggestive procedure, provided it can be shown that the witness does so without relying on the improper identification. *State v. Ponds*, 227 Kan. 627, 630, 608 P.2d 946 (1980).

By holding that prehypnosis statements are admissible, we are

still met with the possibility of "suggestiveness" and "enhanced confidence." As stated in *People v. Hughes,* 59 N.Y.2d at 546, "The problem is greatest when the hypnotist suggests to the person under hypnosis that a certain event occurred or that the person will recall everything when he returns to the normal state of consciousness." In light of this problem, the *Hughes* court held that a pretrial conference should be conducted to determine the extent of the witness's prehypnotic recollection (in order to establish the boundaries of admissible testimony) and whether the hypnosis was so impermissibly suggestive as to require exclusion of in-court testimony with respect to such prehypnotic recollection. We adopt this approach and hold that a pretrial conference shall be conducted wherein the court makes the specific findings as to prehypnotic recollection and suggestibility.

In the case at bar, the trial court did conduct a pretrial hearing wherein all evidence concerning prehypnotic statements and the procedures employed during hypnosis was presented. After hearing the evidence and considering the briefs presented, the court first concluded that Officer Mullikin had never been hypnotized and so his testimony was admissible. We will not disturb the trial court's finding on this matter, especially since Mullikin never identified the assailant. Moreover, his identification of Haislip as the person he saw in the vicinity was not based on anything said during hypnosis.

The court went on to find that Dale Jackson's testimony was admissible so long as he did not testify to any facts revealed for the first time under hypnosis. Implicit in the court's finding was the determination that the hypnosis procedure was not overly suggestive. Based upon our review of the record and the rule adopted as expressed in this opinion, we affirm the decision of the trial court on the issue of hypnosis.

The trial court's refusal to grant funds for the defendant to obtain an expert in hypnosis was a discretionary ruling. In view of the trial court's ruling that Dale Jackson could testify only as to facts he revealed prior to the hypnotic sessions, we cannot say the trial court abused the exercise of its power of discretion. Counsel for the defense were competent to cross-examine the State's experts on hypnosis to the fullest extent, had they desired

to do so, particularly as to posthypnotic recollection of facts revealed by Jackson prior to hypnosis.

Similarly, the trial court did not err by refusing to suppress the in-court identification of the defendant made by Dale Jackson.

The next three issues concern the rather extensive publicity afforded this case by the Wichita news media. In order to prove that he could not receive a fair trial in Wichita and that his motion for change of venue should be granted, the defendant moved to obtain funds for a public opinion survey, and to conduct an individualized voir dire in order to determine if any potential juror had been "tainted" by the publicity. The court denied both motions. Even though the State had joined in the motion for an individualized voir dire, the court held this was unnecessary, but that "[i]f a special occasion arises that calls for caution, I will try to be circumspect in that regard." The court held that a public opinion poll was unnecessary, reasoning that the voir dire examination would be sufficient to determine whether a fair trial could be held.

In arguing on the motion for a change of venue, the defense counsel stated, "At this time in view of the fact that the only possible way to obtain such a change of venue would be through a public opinion poll and we don't have the time or resources to conduct that, we would submit that motion to the Court with no further evidence and no further argument." Following voir dire, the trial court denied the motion for change of venue.

The defendant claims the trial court erred in denying each of these motions.

In this state, the granting or denial of a motion to provide funds for investigative services to counsel for an indigent defendant in a criminal prosecution is a matter which rests within the sound discretion of the trial court. K.S.A. 1984 Supp. 22-4508; *State v. Frames*, 213 Kan. 113, 515 P.2d 751 (1973). The trial court's ruling will not be disturbed in the absence of a showing that the exercise of its power of discretion has been abused to the extent that a defendant's substantial rights have been prejudiced.

We find the trial court did not abuse the exercise of its power of discretion by denying defendant's motion to obtain funds to conduct a public survey. The cost of the survey would have been approximately $2,000 and would have delayed the trial by at least three weeks. Moreover, a random sample of the population would not reliably indicate whether a fair and impartial jury

could be selected. The record is completely devoid of evidence that difficulties involving community prejudice were encountered at the trial.

In this case, six prospective jurors were excused for cause, twenty-one were excused by peremptory challenge, twelve served on the jury, and two were selected as alternates. Of the six jurors excused, five of those excused stated they had fixed opinions. The defendant fails to cite any challenge for cause not granted by the trial court. Defendant does not contend that any juror not excused should have been excused. Therefore, the defendant has failed to show that he was in any way prejudiced by the denial of the motion to obtain funds to conduct a public opinion survey. The motion was properly denied.

Likewise, the defendant has failed to show he was prejudiced by the trial court's refusal to conduct an individualized voir dire.

The purpose of the voir dire examination is to enable parties to select jurors competent to judge and determine the facts and issues without bias, prejudice, or partiality. *State v. Guffey,* 205 Kan. 9, 468 P.2d 254 (1970). The nature and scope of the voir dire examination is within the sound discretion of the trial court. *State v. Darling,* 208 Kan. 469, 493 P.2d 216 (1972).

In his brief, defendant states that he made this motion in order to prevent the entire panel from being prejudiced by a possible unresponsive statement made while panel members were being questioned about their knowledge of the case. This never occurred. Therefore, it appears that the defendant's argument is moot.

Moreover, it has already been noted that the defendant failed to show that the jury was unfair or impartial or that additional jurors should have been dismissed for cause. K.S.A. 22-3407(1) provides that, "Any objection to the manner in which a jury panel has been selected or drawn shall be raised by a motion to discharge the jury panel." Since no motion was made, the defendant has little standing to assert this issue.

In arguing that the trial court erred in denying his motion for change of venue, the defendant contends that he could not get a fair trial because of pretrial publicity. The defendant presented no evidence to the court in support of his motion.

Change of venue is governed by K.S.A. 22-2616. It requires that pretrial publicity be so great as to deny a defendant the

opportunity to a fair and impartial trial. The change lies within the sound discretion of the trial court and will not be disturbed on appeal absent a showing of prejudice to the substantial rights of the defendant. *State v. Cameron & Bentley,* 216 Kan. 644, 533 P.2d 1255 (1975). Media publicity alone has never established prejudice. *State v. May,* 227 Kan. 393, 394-95, 607 P.2d 72 (1980). The burden is cast upon the defendant to show prejudice in the community, not as a matter of speculation but as a demonstrable reality. *State v. Taylor,* 234 Kan. 401, 404, 673 P.2d 1140 (1983).

In this case the defendant presented no evidence in support of his motion for change of venue. Further, he has failed to demonstrate that jury selection was inordinately difficult due to pretrial publicity. The trial court properly denied a motion for change of venue under these circumstances.

Finally, the defendant contends that the trial court erred in permitting the State to introduce prior testimony of Anthony Ray Martin.

.The State planned to call Martin as a witness. Martin's attorney advised the court that Martin would plead the Fifth Amendment privilege against self-incrimination if he was called. On the day he was to be called, the court conducted an in-chambers hearing with all counsel and Martin present. When Martin was asked by the State about his recollection of the early morning hours of November 8, 1980, he responded, "I plead the Fifth, take the Fifth."

The trial court found that Martin was unavailable as a witness and allowed the State to introduce his prior recorded testimony. The State only introduced the portion of Martin's testimony from the previous trial in which he stated that he'd seen Haislip shoot the police officer. The defendant then caused the entirety of Martin's testimony from the previous trial to be read into evidence.

On appeal, the defendant argues that the State should have been precluded from offering testimony which it believed was untrue. The defendant further argues that, since Martin denied any involvement in the shooting, his testimony would not have "incriminated" him and, therefore, the court erred in finding him unavailable to testify.

The defendant's first argument is without merit. While the State admits that it believed much of Martin's testimony was

untrue, it only introduced that portion which it believed was true, that is, the identification of the defendant as the assailant. Since Dale Jackson had also testified that he saw the defendant shoot the gun, the State had reason to believe this portion of Martin's testimony was true. Therefore, the State was not "knowingly soliciting" false testimony. This court expressly precluded such practice in *State v. Fosnight,* 235 Kan. 52, 679 P.2d 174 (1984). We find that the State acted in good faith. Moreover, since the defense was allowed to read Martin's testimony in its entirety, the jurors were allowed to decide for themselves whether anything Martin said was likely to be true.

The trial court did not err in finding Martin to be "unavailable" as a witness within the meaning of K.S.A. 60-459(g)(1). The privilege against self-incrimination is embodied in K.S.A. 60-425. K.S.A. 60-424 provides that a matter is incriminating "if it constitutes, or forms an essential part of, or, taken in connection with other matters disclosed, is a basis for reasonable inference of such a violation of the laws of this state as to subject the person to liability to punishment therefor, unless he or she has become for any reason permanently immune from punishment for such violation."

In Martin's prior testimony, he stated that he was present at the scene of the crime, had handled the pool cue case, and had witnessed the shooting. Since Martin was charged as an aider and abettor in this crime, testimony which placed him at the scene was indeed incriminating, especially when taken in conjunction with testimony of witnesses who identified Martin as the assailant.

The trial court correctly concluded that Martin was "unavailable." Since the defendant had a previous opportunity to examine the witness on the same issues, the prior recorded testimony was properly admitted. K.S.A. 60-460(c); *State v. Lashley,* 233 Kan. 620, 628, 664 P.2d 1358 (1983); *State v. Terry,* 202 Kan. 599, 451 P.2d 211 (1969).

The judgment of the lower court is affirmed.