(627 P.2d 1174)

No. 52,145

STATE OF KANSAS, *Appellee,* v. MICHAEL MONROE CONLEY, *Appellant.*

Opinion filed May 8, 1981.

*Lelyn J. Braun,* of Braun & Nyswonger, Chartered, of Garden City, for appellant.

*Paul Handy,* county attorney, *Don Vsetecka,* former county attorney, and *Robert T. Stephan,* attorney general, for appellee.

Before JUSTICE PRAGER, presiding, ABBOTT, J., and J. PATRICK BRAZIL, District Judge, assigned.

ABBOTT, J.: This is a direct appeal by the defendant, Michael Monroe Conley, from his conviction of voluntary manslaughter in violation of K.S.A. 21-3403.

Conley raises four issues on appeal. The first three allege that the trial court erred (1) in admitting into evidence photographs of the victim's body and the scene of the crime; (2) in excluding the testimony of Dr. V. A. Leopold concerning statements attributed to Conley while under hypnosis; and (3) in instructing the jury on the law of involuntary manslaughter. The fourth argument is that the record does not contain competent evidence to support the conviction.

The deceased and Conley were cotenants in a mobile home and were employed by the same company. The record does not indicate that they had ever been involved in an altercation with each other. The deceased, Jeff Thompson, was killed in the early morning hours of September 20, 1979, by a shot in the back from a 12-gauge shotgun.

Conley had spent the evening preceding Thompson's death at a party. Conley had prepared a mixture of 190-proof grain alcohol and fruit juice, some of which he drank and became intoxicated. He was involved in two different fights at the party that are unrelated to Thompson's death. Shortly after midnight, Conley was driven by a friend, Rhonda Becker, to the mobile home he occupied with Thompson. Rhonda Becker testified that Conley fell several times between the car and the mobile home. Conley fell again in the mobile home, and Ms. Becker enlisted Thompson's aid in transporting Conley to the back bedroom. Thompson, rather unceremoniously, grasped Conley's ankles and proceeded to drag him, face down, to the bedroom. Conley apparently resented the method used to transport him and a fight ensued. Ms. Becker attempted to break up the fight, but was thrown against a wall by Thompson. She testified that Conley was on the floor and Thompson was on top of Conley striking him. She went to the front of the mobile home and called Susan Fraze, a friend whose help she solicited in trying to break up the fight. Thompson was shot while Ms. Becker was phoning for help. At trial, she testified she did not hear a gunshot and did not see a gun. The recipient of the call testified that during the call Rhonda Becker stated in a

hysterical voice, "Oh, my God, he's going to kill him." Ms. Becker then went into the bedroom and observed blood all over the floor and wall; Thompson was lying on the floor on his back, apparently dead. Conley, who was standing by a closet, just stared at her and said nothing. She did not observe a gun. She immediately left the mobile home and did not return.

Susan Fraze and Alice Foster were the next persons to arrive at the scene. They found Thompson's body lying in the front yard. Pictures introduced into evidence show that Conley grasped Thompson's ankles, dragged the body the length of the mobile home, out the front door, and threw it off the front porch. There was a massive amount of blood at the spot where Thompson was shot, and a trail of blood where the body had been dragged along the floor. Conley was observed lying on the floor in the front room appearing to be asleep with blood all over his hands, shirt, trousers and shoes. The 12-gauge shotgun that was determined to be the weapon used to shoot Thompson was found inside the bedroom closet in a leather gun case, with the zipper zipped closed. A spent 12-gauge shotgun shell was found on the floor near the closet. Other facts will be added as they become relevant to a discussion of the issues.

Conley first argues he was prejudiced at trial by the admission into evidence of certain photographs which were taken of the mobile home where the murder occurred, including some shots of the victim's body and several shots of the bloody trail left when the victim was dragged through the trailer and out into the yard. Conley contends he had stipulated to the cause of death, and the introduction into evidence of the photographs served no relevant evidentiary purpose other than to inflame the minds of the jurors and prejudice them against the defense. Such an argument was recently the subject of discussion in *State v. Dargatz,* 228 Kan. 322, 329, 614 P.2d 430 (1980):

"Defendant also claims reversible error in the admission, over objection, of photographs of the victim. Defendant claims that these photographs were inflammatory and unnecessary to the State's case, as there was no dispute as to the identity of the victim or the manner in which he was killed. In *State v. Campbell,* 210 Kan. 265, 500 P.2d 21 (1972), the issue of gruesome photographs was raised. There it was held:

" 'Even where the defendant concedes the victim's death and the cause of death, it is incumbent upon the prosecution to prove as a part of its case in chief all elements of the crime charged; and photographs to prove the elements of the crime, including the fact and manner of death, and the violent nature of the death,

and to corroborate the testimony of other witnesses, are relevant and admissible.'
p. 276."

As we view Conley's stipulation, it was that Thompson's death was caused by a shotgun blast. The issue of Conley's culpability and the degree of culpability were still in issue. The photographs served to illustrate the cause of the victim's death and to give some indication of what had occurred. They also served to corroborate the trial testimony of Dennis Michel, the undersheriff of Finney County. We have examined the photographs and we are of the opinion that the trial court did not abuse its discretion in permitting these photographs into evidence.

We also are of the opinion that the trial judge properly instructed the jury on the lesser included offense of involuntary manslaughter. Contrary to defendant's argument, involuntary manslaughter is a lesser included offense of second degree murder. *State v. Seelke,* 221 Kan. 672, Syl. ¶ 1, 561 P.2d 869 (1977). The essence of defendant's argument lies in his belief that the voluntary intoxication defense which he put before the jury at trial barred any conviction for involuntary manslaughter. Such an argument must fail in light of *Seelke,* wherein the Kansas Supreme Court stated at page 678:

"In some cases the evidence presented at the trial has tended to show some provocation or mitigating circumstances providing an explanation for the killing or raising a legitimate issue as to whether the defendant had the intention to kill the decedent. An intent to kill is a necessary element of murder in the first degree (K.S.A. 21-3401 [1]), murder in the second degree (K.S.A. 21-3402), and voluntary manslaughter (K.S.A. 21-3403). Under certain circumstances in a murder case where a defendant asserts the defense of voluntary intoxication an instruction may be required on the lesser offense of involuntary manslaughter which does not require the specific intent to kill. K.S.A. 21-3208 provides in substance that an act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind. In *State v. Rumble,* 81 Kan. 16, 105 Pac. 1, this court held that drunkenness may reduce a homicide from murder to manslaughter if it is so extreme as to prevent the existence of intention to kill. In that case a new trial was granted to the defendant who was charged with murder where the court failed to instruct on the effect of voluntary intoxication. *State v. Rumble,* supra, is cited with approval in *State v. Harden,* 206 Kan. 365, 480 P.2d 53."

As noted in *Seelke,* when a defendant is charged with murder in the first degree (K.S.A. 21-3401), the crimes of murder in the second degree (K.S.A. 21-3402), voluntary manslaughter (K.S.A.

21-3403) and involuntary manslaughter (K.S.A. 1980 Supp. 21-3404) are considered to be lesser degrees of the crime charged. Not only was the instruction on involuntary manslaughter warranted, it was required, for a trial judge has a duty under K.S.A. 21-3107 to instruct on a lesser degree of a crime when there is evidence on which the accused might reasonably be convicted of the lesser offense.

Conley next argues the trial judge erred in excluding the testimony of Dr. V. A. Leopold concerning statements attributed to Conley while he was under hypnosis. If Dr. Leopold had been allowed to testify, he would have testified that Conley told him Thompson took the gun out of the closet and used it as a prod; that Thompson grasped the barrel of the gun with both hands, and during the struggle the gun discharged. The record before us does not give Conley's explanation of how the charge struck Thompson in the back. The trial court heard Dr. Leopold's testimony outside the presence of the jury, determined that the proffered evidence was not scientifically accurate and excluded it.

The admissibility of hypnotic evidence has never before been considered by Kansas appellate courts. There is, however, considerable case law on the subject from other jurisdictions. See Annot., 92 A.L.R.3d 442 (1979). While it is true that a few jurisdictions have permitted hypnotic evidence to be admitted under limited circumstances (*e.g., People v. Modesto,* 59 Cal. 2d 722, 31 Cal. Rptr. 225, 382 P.2d 33 [1963]; *Harding v. State,* 5 Md. App. 230, 246 A.2d 302 [1968], *cert. denied* 395 U.S. 949 [1969]; *State v. Harris,* 241 Or. 224, 405 P.2d 492 [1965]), the vast majority of authorities have concluded that hypnotic evidence, whether in the form of the subject testifying in court under hypnosis or through another's revelation of what the subject said while under hypnotic trance, is not admissible. The general rule is that hypnotic evidence is inadmissible because it lacks general scientific recognition of efficacy. 2 Jones on Evidence § 14.48 (6th ed. 1972). Representative of such authority is the case of *Greenfield v. Commonwealth,* 214 Va. 710, 715-16, 204 S.E.2d 414, 92 A.L.R.3d 432 (1974). There, the court stated:

"Most experts agree that hypnotic evidence is unreliable because a person under hypnosis can manufacture or invent false statements. [Citations omitted.] A person under a hypnotic trance is also subject to heightened suggestibility. McCormick, Law of Evidence, § 208 at 510 (2d ed. 1972). There it is said:

" 'Declarations made under hypnosis have been treated judicially in a manner

similar to drug-induced statements. The hypnotized person is ultrasuggestible, and this manifestly endangers the reliability of his statements. The courts have recognized to some extent the usefulness of hypnosis, as an investigative technique and in diagnosis and therapy. However, they have rejected confessions induced thereby, statements made under hypnosis when offered by the subject in his own behalf, and opinion as to mental state based on hypnotic examination.' (Footnotes omitted.)

*See also* Note: 'Hypnotism, Suggestibility and the Law,' 31 Neb. L. Rev. 575, 576 (1952).

"In fact, we have held that 'truth serum' test results were properly excluded by the trial court because they were unreliable and led to self-serving answers."

Most courts have analogized the issue of hypnotic evidence to questions concerning lie detector tests and truth serums. 2 Jones on Evidence § 14.48 (6th ed. 1972); see Spector and Foster, *Admissibility of Hypnotic Statements: Is the Law of Evidence Susceptible?* 38 Ohio State L. J. 567 (1977). It is well settled in Kansas that truth serum tests and lie detector tests are not admissible in evidence for the purpose of proving the truth of the matter asserted by the defendant. See *State v. Hemminger,* 210 Kan. 587, 595, 502 P.2d 791 (1972). We conclude that testimony obtained from an accused under hypnosis that is offered to prove the truth of the matters asserted by the accused is analogous to testimony obtained by truth serum and lie detector tests and, in the absence of a binding agreement to admit the evidence, is not admissible. Furthermore, even the states that recognize limited admissibility of hypnotic evidence recognize that the admissibility of such evidence lies in the sound discretion of the trial judge. Annot., 92 A.L.R.3d 442, § 2. The trial judge exercised great care in ruling on the admissibility of the proffered evidence, and based on the record before us it appears that even if this court were to adopt the minority rule, which it declines to do, the trial judge did not abuse his discretion in excluding the proffered evidence.

Conley contends that the record contains insufficient evidence to support the jury's verdict. He argues that the evidence is overwhelming that he was too intoxicated to form the necessary intent to kill. The flaw in defendant's argument is that there is conflicting evidence as to the degree of his intoxication at the time of the crime, and the jury chose not to believe his evidence. When conflicting facts are presented on the issue of voluntary intoxication, the question is one for the jury. *State v. Payton,* 229 Kan. 106, 114, 622 P.2d 651 (1981). The record reflects (1) that Conley

conversed with one of the witnesses, an emergency medical technician, shortly after the shooting, and remembered the witness' sister as well as the type of car the witness drove; (2) that immediately after the shooting, Conley removed the victim from the mobile home by dragging him through the entire mobile home and into the front yard, from which the jury might reasonably infer he was attempting to conceal the body; (3) that Conley apparently fired the shotgun, zipped it back into its case and then placed it back in the closet; (4) that Conley told a prisoner who had been incarcerated in the county jail with him that he remembered shooting the victim and putting the gun away; and (5) that a reasonable inference could be drawn that Conley had the presence of mind to attempt to hide a prohibited substance which he apparently had on his person and which would have been discovered during a search of his person.

It is not the function of an appellate court to reweigh the facts. When the sufficiency of the evidence to support a conviction is raised on appeal, the test is whether the evidence adduced at the trial, when viewed in the light most favorable to the prosecution, convinces the appellate court that a rational factfinder could have found the accused guilty beyond a reasonable doubt. *State v. Moore*, 229 Kan. 73, Syl. ¶ 7, 622 P.2d 631 (1981). In this case, there is substantial competent evidence from which the jury could conclude that Conley was not so intoxicated as to render him unable to commit a specific intent crime such as voluntary manslaughter.

Affirmed.