No. 62,810

STATE OF KANSAS, *Appellant*, v. WILLIAM T. BUTTERWORTH, *Appellee*.

(792 P.2d 1049)

Opinion filed May 25, 1990.

*Debra Byrd Wagner,* assistant district attorney, argued the cause, and *Nola Foulston,* district attorney, and *Robert T. Stephan,* attorney general, were with her on the brief for the appellant.

*Jessica R. Kunen,* chief appellate defender, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

MILLER, C.J.: Hypnotically refreshed testimony of the defendant, William T. Butterworth, was admitted by the trial court over the State's objection during Butterworth's trial on three counts of first-degree murder and one count of felony theft. The jury returned a verdict of acquittal. The State reserved the question of the propriety of the admission of Butterworth's testimony and appeals. K.S.A. 22-3602(b)(3). We deny the State's appeal.

The sole question before us is whether the trial court erred in admitting into evidence defendant Butterworth's posthypnotic recollections. We limit the issue in this case to whether the testimony of a criminal *defendant* who has undergone hypnosis to refresh his or her recollection is admissible and, if so, under what circumstances.

Melvin P. Fager and his daughters, Sherri and Kelli, were found dead at their Wichita home on December 31, 1987. The Fagers' car was missing; also missing was William T. Butterworth, who had been working on a solarium for the Fagers. Three days later, Butterworth called his wife from Florida. She told him the police were looking for him; he then called the police and was arrested and charged with killing the Fagers. Butterworth repeatedly told the police he could remember nothing of what happened during the relevant time period of the murders. He remembered preparing for work on the morning of December 30. The next thing he remembered was hearing a news broadcast on the radio about the Fager murders after which he called his wife.

When Butterworth still had not recovered his lost memory a month after being charged, he told his appointed defense counsel, public defender Richard Ney, that he wished to see a psychologist to see if that would help his recall. After consulting another doctor, Ney obtained a reference to Dr. Robert Pace, a licensed clinical psychologist experienced in the use of hypnosis. This was Ney's first contact with Dr. Pace, who was not regularly employed by defense counsel or the State. Butterworth attended twenty sessions with Dr. Pace in the doctor's office over a four-month period; during ten of those sessions, Butterworth was hypnotized.

Dr. Pace made extensive notes of each session; these were furnished to the court and to counsel at trial. None of the sessions

were tape-recorded and none were videotaped. The following description of the sessions is summarized from Dr. Pace's notes and his testimony.

### SESSIONS WITH THE PSYCHOLOGIST

Ney was present during the first session on February 15, 1988, during which he talked to Dr. Pace regarding fees and explained that Butterworth had no memory of the crimes with which he was charged. Dr. Pace introduced Butterworth to hypnosis techniques and induced a light trance, but did not attempt to regain Butterworth's lost memory. He also directed Butterworth to prepare a written statement of his memories immediately prior to and after his memory lapse.

Dr. Pace talked to Ney alone at the beginning of the second session on February 18. Dr. Pace was somewhat uneasy and had some concern about seeing Butterworth alone. Ney gave Dr. Pace some background information on the Fager family, but gave him no details about the crimes charged. This was the last session that Ney attended. No one but Dr. Pace and Butterworth was present at the rest of the sessions, except when Mrs. Butterworth came in and talked to the doctor after the seventeenth session was terminated.

During the second session, Butterworth discussed the stress his arrest and lack of memory had caused him and his family. Dr. Pace determined that his anxiety was too great for hypnosis at that time and that some of Butterworth's emotional problems must be treated first. At the third and fourth sessions, on February 20 and 27, no hypnosis was attempted.

At the fifth session on March 3, Butterworth was hypnotized; no recall was attempted. Butterworth simply practiced relaxation techniques and visual imaging. Dr. Pace noted the physical indicia of a hypnotized state were present.

During his next session on March 19, Butterworth talked about the stress he and his family were under and how difficult he found it to relax and try to bring back his memory of the lost four days. He said, "Mr. Ney says he's done all he can until something happens here." Using an accepted technique, Dr. Pace hypnotized Butterworth and regressed him to earlier positive experiences in his life. He then regressed Butterworth to an earlier unpleasant experience. This technique prepares the patient

to recover potentially unpleasant memories and enhances the patient's feeling of self-control. It also minimizes bias that might occur if the therapist attempted to direct and rush memory recall.

After a seventh session on March 26 devoted entirely to treatment of anxiety, Dr. Pace hypnotized Butterworth during the eighth session on April 1 and had him continue a series of "successive approximations." This is a technique where the patient is asked to come closer to the feared memory by facing other unpleasant memories. Dr. Pace asked Butterworth, without recalling the time of the murders, to regress to memories of prior adversity and punishment from an authority figure.

On April 9, another session was devoted entirely to treating anxiety. Butterworth talked about viewing pictures of the crime scene the day before. Butterworth was hypnotized during the tenth session on April 12 and visualized the Fagers' home. He also remembered it was cold the morning of the 30th and that he ate lunch at a fast-food restaurant different from the one he usually patronized. During hypnosis in the eleventh session on April 19, Butterworth remembered stopping for coffee on his way to work on the 30th. He also remembered details of his morning's work at the Fagers' home.

Butterworth was not hypnotized during the twelfth session on April 26, but was hypnotized during a two-hour session on April 30. He remembered talking to Mr. Fager before leaving for lunch on the 30th about the work he was doing. He remembered eating lunch and noting when he returned that Mr. Fager had either left or put his car in the garage. He remembered starting work and then thinking someone was in the spa in the solarium because of the smell of chlorine and the condensation on the glass. He thought it might be Kelli Fager and her boyfriend. He felt uncomfortable and decided to leave until they were done so he could work without disturbing them. He then decided to go to the mall to see if there were any after-Christmas sales. He remembered buying some new clothes.

Butterworth was not hypnotized during the fourteenth session on May 2, but was hypnotized during the fifteenth session the next day. He recalled seeing acquaintances while he was at the mall, one of whom was William Dotts, a retired police captain. Butterworth thought it was about 4:30 p.m. when he left the

mall; it was getting dark when he returned to the Fagers' home. There were no lights on in the solarium; he remembered getting his key to open the door.

Butterworth appeared depressed and frightened at the sixteenth session on May 5 and did not wish to be hypnotized. He was hypnotized during a two-hour session on May 7. He recalled seeing the Fagers' car as he returned from the mall. He cried as he recalled opening the solarium door and seeing Sherri Fager face up in the spa. He started to pull her out and realized she was dead. He went into the house and saw Mr. Fager lying dead on the floor. He knelt beside him, saw some keys beside him, and picked them up. He went to his van and tried to leave, but the keys would not work. He started hitting the steering wheel and then realized he was using Fager's keys. He grabbed the sack of new clothes from the van and drove away in the Fagers' car. He said he felt afraid and cowardly for running away. At this point, Butterworth appeared extremely upset. Dr. Pace ended hypnosis and, for the first and only time, allowed Butterworth's wife to come in to comfort him. Dr. Pace, in front of Butterworth, told Butterworth's wife he believed Butterworth to be innocent but suffering from guilt and self-condemnation. Dr. Pace notified Ney that Butterworth had recovered some memory but warned him not to push him very hard.

During the subsequent sessions on May 9 and 11, no hypnosis took place, while Butterworth and Dr. Pace tried to discover why Butterworth had such deep feelings of shame and cowardice. Butterworth noted at the May 9 session that jury selection began that day. He also said that, although Kelli had been found with Sherri, he had only remembered seeing Sherri. He said the spa was not so large that he could have missed seeing Kelli if she had been in the spa.

During the last session on May 14, 1988, Dr. Pace hypnotized Butterworth and asked him to return in his thoughts to the Fager house. Butterworth recalled that he entered the house after finding Sherri in order to call for help. He then saw Mr. Fager and knelt beside him trying to get him to move. He remembered being cold and wet from trying to get Sherri out of the spa. He picked up the keys beside Fager and started to get up when he thought he heard something.

Dr. Pace asked, "What does it sound like?" Butterworth replied, "A bump or something." Dr. Pace noted Butterworth's breathing became more rapid and he told Butterworth to continue. Butterworth said he thought it might be the Fagers' dog, and he started toward the basement stairs where he thought the sound came from. Dr. Pace observed tension throughout Butterworth's body and that he began to cry more heavily. Butterworth said, "It wasn't the dog . . . I thought it was that there was somebody down there. . . I'm so scared. I turn around and step over to the front door. I just had to get out of there." Dr. Pace asked, "Is there something else you haven't told me?" Butterworth replied, "Just the noise." Butterworth said it sounded "[l]ike somebody trying to cry or scream and I couldn't . . . . " He said he saw the Fagers' car when he could not start his van and drove away in it. He said, "I wanted to go home but I couldn't." He said he could not face his wife. After some time, during which he cried, he asked, "What if it had been my kid?"

Dr. Pace noted "[a]t this point he cries harder than he ever had and had a great deal of body tension. Yet he continued to try to choke the tears back. I observe that his face was so flushed, the pulse is evidenced by the artery in his neck and by the muscle tension that he was extremely emotional." Butterworth finally said, "I keep thinking it could have been my kids and I just ran away." Butterworth then remembered drawing some money from an automatic teller machine and driving past his house, wanting to go in. Instead, he drove to Florida. At this point Dr. Pace ended the hypnosis while Butterworth cried. Dr. Pace asked, "Are you thinking Kelly [sic] was still down there and alive?" Butterworth shook his head yes and said, "It sounded like it." Butterworth then talked about how, if he had not been cowardly, Kelli might not have been killed. He said he feared he might abandon his own children in such a situation.

## TRIAL

Trial commenced on Monday, May 9, 1988. A jury was impaneled and sworn. Counsel for the State and the defendant made opening statements. The State first learned of the hypnotic sessions, and of the defense's intention to present Butterworth's testimony based, in part, on his posthypnotic recall, during Mr. Ney's opening statement for the defense. The State objected to

the introduction of such evidence. The court excused the jury and heard arguments of counsel on the admissibility of the proposed testimony.

The State contended it should have been informed prior to trial of the use of hypnosis. The State had been granted reciprocal discovery pursuant to K.S.A. 22-3212(3) during pretrial proceedings. Ney explained he did not plan to call Dr. Pace as a witness at trial, but simply to allow Butterworth to testify. Ney also stated that he had no reports concerning the therapy sessions, which were still ongoing, and that Butterworth's recall occurred only a few days prior to trial. He argued that the hypnosis had been carried out in a reliable manner as suggested in *Rock v. Arkansas*, 483 U.S. 44, 97 L. Ed. 2d 37, 107 S. Ct. 2704 (1987), and that Butterworth's recollections were admissible because of an accused's constitutional right to testify in his own defense. The judge continued the trial until Wednesday, May 18, pending an evidentiary hearing on the admissibility of the posthypnotic recall. The court required Dr. Pace to turn over his records on Butterworth for an in camera inspection. Dr. Pace's notes were given to both counsel prior to the hearing.

## THE ADMISSIBILITY HEARING

After considering *Rock* and other recent cases concerning posthypnotic testimony, the judge set forth the safeguards he would look for in deciding the admissibility of Butterworth's posthypnotic recollections. These were as follows:

1. The hypnotic sessions should be conducted by a licensed psychiatrist or psychologist trained in the use of hypnosis.
2. The hypnotist should be independent of and not responsible to the prosecution or the defense.
3. Information received by the hypnotist prior to the hypnosis concerning the event in question should be in written form so that it may subsequently be determined to what extent the subject received information or suggestions from the hypnotist.
4. The hypnotist should obtain a detailed description of the event as the subject remembered it during hypnosis, carefully avoiding influencing the description by asking structured questions or adding new details.

5. All contact between the hypnotist and the subject should be recorded to establish that the subject has not received any undue suggestions or new information.
6. Only the hypnotist and the subject should be present during the hypnosis and related sessions.

The admissibility hearing commenced on May 16, 1988. Dr. Pace testified it was his opinion Butterworth had been suffering from suppression after being exposed to something terrifying. He said that Butterworth's manner of recovery was similar to his other trauma patients such as incest victims and Viet Nam veterans. He found a consistency of behavior within and between sessions which he believed supported his conclusions. He testified that, although he could not know whether Butterworth was lying under hypnosis, he did not believe Butterworth feigned his trances. He observed that the physical signs of a trance, such as heavy breathing and rolling back of the eyes, were present.

Dr. Pace testified he had no significant knowledge of the charges against Butterworth. He received no information from the police; Ney provided him with some information about the Fager family during the first session. He said he had written down in his notes all information received from outside sources. He made no suggestions to Butterworth during hypnosis. He also testified that his notes were, as far as possible, verbatim and that no significant sessions or portions of sessions were omitted. He had extensive training in hypnosis and had used it extensively in his practice for over fifteen years. The State's cross-examination of Dr. Pace cover over 100 pages of the record.

The State called Dr. Richard L. Ault, a special agent of the Federal Bureau of Investigation, who holds a Ph.D. in counseling, and who has supervised hundreds of cases where hypnosis has been used in law enforcement. He has conducted only about 25 hypnotic sessions himself, as these are normally conducted by a psychiatrist or psychologist. He testified concerning the unreliability of posthypnotic recall, unless it is corroborated. He also stated that some of the people who were the subject of hypnotic sessions which he supervised had later testified in court as to their posthypnotic recollections. His entire testimony extends over approximately 25 pages of the record.

The trial court ruled the sessions had been substantially safe-guarded. Quoting *Rock*, it stated, "Such guidelines do not guar-antee the accuracy of the testimony, because they cannot control the subject's own motivations or any tendency to confabulate, but they do provide a means of controlling overt suggestions." 483 U.S. at 60-61. The court specifically found:

1. The hypnotic sessions were conducted by a licensed psychologist.
2. The psychologist was not influenced by any party to a degree that tainted the sessions.
3. The psychologist's prior knowledge of the case was <u>not</u> writ-ten down.
4. A written, detailed, prehypnotic memory was recorded by the defendant prior to any memory recovery due to hypnosis.
5. The doctor's notes were a sufficient record of the hypnotic sessions, although a complete audio and video record is preferred.
6. No one but the hypnotist and the subject were present during all but the first hypnosis session. The first session was not meaningful as it related to Mr. Butterworth's post-hypnotic memory.

The court found the failure of safeguards which had occurred was not significant enough to deny admissibility of Butterworth's tes-timony. It thus found the testimony admissible, subject to ex-amination as to the weight to be given the testimony. The court found the defendant's expert, Dr. Pace, more qualified than the State's, Special Agent Ault, who had a Ph.D. in counseling but was not a licensed psychologist. The court noted that Dr. Pace believed that no outside factors influenced his conduct or But-terworth's posthypnotic memory. It also noted that the State presented no evidence to rebut this testimony. The State reserved the issue of the admissibility of the testimony for appeal.

## TRIAL CONCLUDED

Trial resumed on May 18. The State presented its evidence and rested. Butterworth testified in his own behalf and recalled the events surrounding the murders as he had under hypnosis. Dr. Pace also testified as to Butterworth's recollection under hypnosis. The State's expert rebutted defense evidence by tes-

tifying that Dr. Pace's sessions did not meet the established safeguards for insuring the reliability of posthypnotic recollections. The jury acquitted Butterworth of all charges.

## PRIOR CASE LAW

The first Kansas appellate case concerning the use of hypnosis is *State v. Conley*, 6 Kan. App. 2d 280, 627 P.2d 1174, *rev. denied* 229 Kan. 671 (1981). The defendant claimed error in the trial court's exclusion of the testimony of his doctor concerning statements the defendant made while hypnotized. A unanimous panel of the Court of Appeals held "that testimony obtained from an accused under hypnosis that is offered to prove the truth of the matters asserted by the accused is analagous to testimony obtained by truth serum and lie detector tests and, in the absence of a binding agreement to admit the evidence, is not admissible." 6 Kan. App. 2d at 285.

Four years later, this court considered the issue of posthypnotic recollection in *State v. Haislip*, 237 Kan. 461, 701 P.2d 909, *cert. denied* 474 U.S. 1022 (1985). Haislip appealed his murder conviction, claiming the trial court erred in failing to suppress the testimony of two prosecution witnesses who had been hypnotized. This court held:

"Given the problems inherent in the hypnotic process, such as the enhanced suggestibility of the subject, the tendency to confabulate when there are gaps in recollection, and the increased confidence in the truthfulness and accuracy of post hypnotic recall which may preclude effective cross-examination, hypnotically refreshed testimony is simply too unreliable to be used as evidence in a judicial setting. We hold that hypnosis has not reached a level of scientific acceptance which justifies its use for courtroom purposes, and, according to the *Frye* test [see *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923)], events recalled subsequent to hypnosis are not admissible. We further conclude that no set of procedural safeguards can adequately remedy this unreliability.

"Our rule of inadmissibility does not, however, render all testimony of a previously hypnotized witness inadmissible. A person who has been hypnotized may testify to facts which he related before the hypnotic session." 237 Kan. at 482.

We further held that, prior to admitting any testimony from a witness who had undergone hypnosis, the trial court must conduct a pretrial hearing in order to determine the extent of the witness' prehypnotic recollection and whether the hypnosis was

so impermissibly suggestive as to require exclusion of in-court testimony with respect to such *pre*hypnotic recollection. 237 Kan. at 483. We affirmed Haislip's conviction because the evidence showed the witnesses' testimony was not based on facts revealed for the first time under hypnosis, and the trial court's pretrial hearing on the matter supported the court's implicit finding that the hypnosis procedure was not improperly suggestive.

## *Rock v. Arkansas*

Our state pronouncements on the subject were followed in 1987 by *Rock v. Arkansas,* 483 U.S. 44. Rock was charged with manslaughter in the shooting death of her husband. She remembered grabbing a gun because her husband began choking her during a fight. Because she could not remember the precise details of the shooting, she underwent hypnosis. After hypnosis, she remembered she had not held her finger on the trigger of the gun, which had discharged when her husband grabbed her arm. This recollection led to an expert inspection of the gun, which revealed the gun was defective and prone to fire when hit, without the trigger being pulled.

At trial the court limited Rock's testimony to memories stated before hypnosis, and she was convicted of manslaughter. The Arkansas Supreme Court affirmed, following the approach taken by a number of states, including Kansas, that recollections due to hypnosis are inadmissible per se. See 483 U.S. at 57.

The United States Supreme Court held that a per se rule prohibiting the admission at trial of an accused's hypnotically refreshed testimony violates the accused's constitutional right to testify on his own behalf as guaranteed by the Fifth Amendment privilege against self-incrimination, the right to compulsory process and to conduct one's own defense as guaranteed by the Sixth Amendment, and the right to due process as guaranteed by the Fourteenth Amendment.

The court found the Arkansas per se rule limiting an accused's testimony to matters he can prove were remembered before hypnosis operated "to the detriment of any defendant who undergoes hypnosis, without regard to the reasons for it, the circumstances under which it took place, or any independent verification of the information it produced." 483 U.S. at 56.

The court noted that "[h]ypnosis by trained physicians or psychologists has been recognized as a valid therapeutic technique since 1958, although there is no generally accepted theory to explain the phenomenon, or even a consensus on a single definition of hypnosis." 483 U.S. at 58-59. The court's research led it to conclude that the most common response to hypnosis is an increase in both correct and incorrect memories:

"Three general characteristics of hypnosis may lead to the introduction of inaccurate memories: the subject becomes 'suggestible' and may try to please the hypnotist with answers the subject thinks will be met with approval; the subject is likely to 'confabulate,' that is, to fill in details from the imagination in order to make an answer more coherent and complete; and, the subject experiences 'memory hardening,' which gives him great confidence in both true and false memories, making effective cross-examination more difficult." 483 U.S. at 59-60.

The court was not prepared to endorse without qualification the use of hypnosis, observing that "scientific understanding of the phenomenon and of the means to control the effects of hypnosis is still in its infancy." 483 U.S. at 61. The court suggested a state "would be well within its powers if it established guidelines to aid trial courts in the evaluation of posthypnosis testimony." 483 U.S. at 61.

The court held, however, that a state is not justified in a per se rule excluding all of a defendant's testimony that the defendant is unable to prove to be the product of prehypnosis memory: "A State's legitimate interest in barring unreliable evidence does not extend to per se exclusions that may be reliable in an individual case." 483 U.S. at 61. The court held hypnosis has not been shown to be "always so untrustworthy and so immune to the traditional means of evaluating credibility" that it should always disable an accused from presenting his version of the events for which he is tried. 483 U.S. at 61.

### SUBSEQUENT CASES

Louisiana and Texas are the only states thus far which have decided appeals subsequent to *Rock* concerning the hypnotically refreshed testimony of a criminal defendant. Louisiana now allows hypnotically refreshed testimony of a criminal defendant subject to strict safeguards. See *State v. Holden*, 554 So. 2d 121 (La. App. 1989); *State v. Woodfin*, 539 So. 2d 645 (La. App. 1989).

Texas allows hypnotically refreshed testimony of a criminal defendant if the trial court finds the testimony trustworthy under the totality of the circumstances. See *Tumlinson v. State*, 757 S.W.2d 440 (Tex. Crim. 1988); *Zani v. State*, 758 S.W.2d 233 (Tex. Crim. 1988).

In *Tumlinson*, the trial court had rejected an audiotape recording of hypnotically induced testimony and the testimony of his hypnotist. The Texas Court of Appeals affirmed, for several reasons: The hypnotist was not qualified as a psychologist or psychiatrist. Defense counsel was present in the room during hypnosis. No videotape was made of the session, only an audio recording. There was no record of the information given to or known by the hypnotist concerning the case prior to hypnosis. Finally, there was no record of the facts as the defendant remembered them prior to undergoing hypnosis.

In *Tumlinson*, the Texas Court of Criminal Appeals cited and relied upon *Zani*, which is the lead case in an extensive annotation, *Admissibility of Hypnotically Refreshed or Enhanced Testimony*, 77 A.L.R.4th 927. The annotation includes a discussion of cases decided both before and after *Rock*. Other insightful discussions of the subject are: Fox and Fox, *Reciprocal Hypnosis: A New Standard for the Admission of Posthypnotic Testimony*, 20 Pacific L.J. 815 (1989); Note, *Hypnosis and the Right to Testify: An Evidentiary and Constitutional Dilemma for Connecticut*, 9 Bridgeport L.R. 359 (1988); and Note, *Fifth, Sixth, and Fourteenth Amendments—A Constitutional Paradigm for Determining the Admissibility of Hypnotically Refreshed Testimony*, 78 J. Crim. L. & Criminology 853 (1988).

## PROCEDURAL GUIDELINES

The Supreme Court of New Jersey, in *State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (1981), adopted procedural requirements similar to those followed by the trial court. The New Jersey court emphasized that none of the enumerated factors "should be considered absolute prerequisites to admissibility, nor are they exclusive." 86 N.J. at 545. We find these factors or guidelines to be helpful and instructive and adopt them for use in the Kansas courts. As set forth in the opinion in *Hurd*, they are as follows:

"First, a psychiatrist or psychologist experienced in the use of hypnosis must conduct the session. This professional should also be able to qualify

as an expert in order to aid the court in evaluating the procedures followed. Although we recognize that there are many other people trained to administer hypnosis and skilled in its use for investigative purposes, we believe that a professional must administer hypnosis if the testimony revealed is to be used in a criminal trial. In this way, the court will be able to obtain vital information concerning the pathological reason for memory loss and the hypnotizability of the witness. Furthermore, the expert will be able to conduct the interrogation in a manner most likely to yield accurate recall.

"Second, the professional conducting the hypnotic session should be independent of and not regularly employed by the prosecutor, investigator or defense. [Of course, the hypnotist may collect a fee from the party who engaged his services.] This condition will safeguard against any bias on the part of the hypnotist that might translate into leading questions, unintentional cues, or other suggestive conduct.

"Third, any information given to the hypnotist by law enforcement personnel or the defense prior to the hypnotic session must be recorded, either in writing or another suitable form. This requirement will help the court determine the extent of information the hypnotist could have communicated to the witness either directly or through suggestion.

"Fourth, *before* inducing hypnosis the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them. The hypnotist should carefully avoid influencing the description by asking structured questions or adding new details.

"Fifth, all contacts between the hypnotist and the subject must be recorded. This will establish a record of the pre-induction interview, the hypnotic session, and the posthypnotic period, enabling a court to determine what information or suggestions a witness may have received during the session and what recall was first elicited through hypnosis. The use of videotape, the only effective record of visual cues, is strongly encouraged but not mandatory.

"Sixth, only the hypnotist and subject should be present during any phase of the hypnotic session, including the pre-hypnotic testing and the post-hypnotic interview. Although it may be easier for a person familiar with the investigation to conduct some of the questioning, the risk of undetectable, inadvertent suggestion is too great . . . . Likewise, the mere presence of such a person may influence the response of the subject." 86 N.J. at 545-46.

We adopt these procedural requirements for use in Kansas courts with one addition:

Seventh. If possible, the hypnosis should be conducted in a neutral setting such as the expert's office. The use of offices or locations controlled by the prosecution or the defense should be avoided.

## SUBSTANTIAL COMPLIANCE ESTABLISHED BY
## A PREPONDERANCE OF THE EVIDENCE

The State contends that the trial court erred in not requiring strict compliance with the procedural safeguards it set out. The trial court, of course, was dealing with an issue without precedent in this state. Some jurisdictions require strict compliance, others require substantial compliance. In *People v. Romero*, 745 P.2d 1003, 1016 (Colo. 1987), *cert. denied* 485 U.S. 990 (1988), the Supreme Court of Colorado held the proponent of testimony from a previously hypnotized witness should bear the burden of establishing its reliability by a preponderance of the evidence. The court noted that some courts have imposed a clear and convincing standard of proof, but noted:

"The preponderance of evidence standard has often been referred to as the 'orthodox view,' since it is in keeping with the traditional burden applicable to the resolution of most preliminary questions of admissibility. See E. Cleary, McCormick on Evidence § 53, at 136 n. 8 (3d ed. 1984); 1 J. Wigmore, Evidence § 17, at 771 n. 20 (Tillers rev. 1983). Indeed, it has been cogently observed that the preponderance of evidence standard 'is appropriate for resolving most preliminary fact questions, even in a criminal case, and even when the reliability of the ultimate verdict is arguably affected by the decision on the preliminary issue.' Saltzburg, *Standards of Proof and Preliminary Questions of Fact*, 27 Stan. L. Rev. 271, 291 (1975), *cited with approval in* 1 D. Louisell and C. Mueller, Federal Evidence § 35, at 266 (1977)." 745 P.2d at 1016.

The court noted that:

"The United States Supreme Court has held that the preponderance standard is applicable in determining the constitutional admissibility of a confession. *Lego v. Twomey*, 404 U.S. 477, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972). Other federal courts have expressly found a preponderance standard to be sufficient for purposes of resolving other preliminary questions of admissibility. *E.g., United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977) (proof of conspiracy as precondition for admitting statement of co-conspirator); *In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238 (3d Cir. 1983) (foundation for business records exception)." 745 P.2d at 1016 n.10.

At stake here, as the United States Supreme Court noted in *Rock*, is the constitutional right of an accused to testify in his or her behalf at a criminal trial. We conclude that substantial compliance with the procedural safeguards should be required since these safeguards are not exclusive and none are absolute prerequisites to admissibility. Whether any deviation from the safe-

guards is sufficient cause to reject the testimony is left to the sound judicial discretion of the trial court.

## PRETRIAL HEARING

When posthypnotic testimony of the accused is to be offered, a hearing should be held before trial or outside of the hearing of the jury to determine the admissibility of the testimony. The defendant bears the burden of establishing, by a preponderance of the evidence, that substantial safeguards were utilized. That burden was met here. The trial court in this case followed the correct procedures and did not abuse its discretion in ruling that the sessions had been substantially safeguarded. It thus did not err in admitting defendant's testimony.

## NOTICE

Finally, in order that the State may be prepared to adequately cross-examine the defendant and to secure its own expert witnesses, the defense must notify the prosecution as early as possible when it is anticipated that hypnotically refreshed testimony of the defendant will be offered in his or her own behalf. In the case at hand, defense counsel did not know until the time of trial whether posthypnotic recollections would be offered in evidence. The defense should have alerted the State to that possibility at an early date. However, the lengthy recess taken by the trial court afforded the State an adequate opportunity to secure an expert and to prepare its cross-examination, and there was no prejudice.

The State's appeal is denied.